TIMOTHY COURCHAINE
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
Arizona State Bar No. 029059
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: Matthew.Williams3@usdoj.gov

COLIN M. MCDONALD
Assistant Attorney General
National Fraud Enforcement Division
U.S. Department of Justice

SHANE BUTLAND
William Hochul III
Trial Attorneys
Health Care Fraud Section
National Fraud Enforcement Division
U.S. Department of Justice
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-286-1177
Email: Shane.Butland2@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Brian Rowan,<br><br>Defendant. | No. CR-26-00660-PHX-DGC<br><br>**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR BILL OF PARTICULARS** |

Defendant Brian Rowan's ("the Defendant") motion for a bill of particulars, which was filed seven business days after his arraignment and the entry of a protective order [ECF Nos. 16, 17] and prior to receiving the discovery that the Defendant was told was forthcoming, should be denied. The 23-page speaking Indictment against the Defendant includes all of the essential facts constituting the offenses charged and

provides details necessary to the preparation of a defense, and the allegations are further clarified by the discovery produced and forthcoming, the publicly available co-conspirator filings, and the government's August 21, 2026, disclosure, so an order requiring a bill of particulars is unnecessary and unwarranted.

## PROCEDURAL HISTORY

On June 17, 2026, a grand jury in the District of Arizona returned a 10-count Indictment against the Defendant, charging him with conspiracy to commit health care fraud and wire fraud (18 U.S.C. § 1349), health care fraud (18 U.S.C. §§ 1347 and 2), conspiracy to defraud the United States and to pay kickbacks (18 U.S.C. § 371), payment of kickbacks (42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2), and transactional money laundering (18 U.S.C. § 1957) (the "Indictment"). [ECF No. 3.] The Indictment alleges that the Defendant engaged in a massive Medicare fraud conspiracy in which he caused hundreds of millions of dollars in illegal kickbacks to be paid to medical providers and sales representatives to induce the purchase of amniotic membrane allografts, and that these illegal inducements caused unnecessary allografts to be applied to elderly and vulnerable patients, many of whom were terminally ill in hospice care. *Id.* ¶ 1.

On June 22, 2026, the Defendant was arrested at his Las Vegas, Nevada residence pursuant to the arrest warrant issued in conjunction with the Indictment. At his initial appearance that afternoon, the Defendant was ordered to appear in the District of Arizona when notified to do so, waived his Rule 5 rights to a preliminary hearing and identity hearing, and was released on a personal recognizance bond. [ECF No. 10.]

On July 7, 2026, the District of Arizona issued a summons for the Defendant to appear before U.S. Magistrate Judge Deborah M. Fine on July 29, 2026.

On July 16, 2026, the government and the Defendant conferred concerning the contents of a protective order, which the parties believed necessary due to the volume of sensitive information contained in the government's discoverable material (further discussed below). After coming to an agreement on the contents of the proposed order, the government submitted an unopposed motion for a protective order on July 24, 2026,

prior to Defendant's arraignment. [ECF No. 14.]

On July 29, 2026, the Defendant was arraigned before Magistrate Judge Fine. [ECF No. 17.] At the arraignment, the Defendant asked Judge Fine to direct the government to immediately produce discovery despite acknowledging that a protective order had not yet been issued. Judge Fine denied the request, noting that the unopposed motion for the protective order had been filed a mere three business days prior. The government informed the Defendant and the Court that it would be making a substantial discovery production once the protective order was in place. The Court issued the proposed protective order later that day.[1] [ECF No. 16.]

On August 10, 2026, twelve days after the issuance of the protective order, the government produced over one million documents and other discoverable material to the Defendant. These materials included bank records, electronic device data extractions, interview reports, phone records, federal health care program claims data, real estate records, audio and video recordings, search warrant affidavits and warrant returns, emails, text messages, patient health records, and plea and charging documents of three separately charged defendants, including one of the co-conspirators identified in the Defendant's Indictment. Underscoring the need for the protective order, the production contained voluminous personally identifiable information, such as telephone numbers, dates of birth, social security numbers, addresses, bank account numbers, and Medicare beneficiary identification numbers, as well as the personal health information and other

[1] The Defendant contends that the government should have produced discovery on the date of the Defendant's arrest. *See* ECF No. 20 at 8 ("For 50 days, [the Defendant] has awaited discovery. In those 50 days, the Department has turned over zero pages of discovery. This inaction would shock the Court's conscience in any criminal case . . ."). Conspicuously omitted from this timeline is the Defendant's retention of current counsel to replace his former counsel after his arrest, the parties' efforts to agree on the language of a proposed protective order, and the fact that the protective order was not issued until July 29, 2026, 37 days after the Defendant's arrest. The government has an obligation to protect citizens' personal information and submits that it was reasonable, responsible, and appropriate to wait until a protective order was in place before producing to the Defendant voluminous third-party personally identifiable information and confidential health information.

sensitive personal information of third parties.

The night before this production was mailed to the Defendant, the Defendant filed the instant motion seeking a bill of particulars. [ECF No. 20.] In his motion, the Defendant seeks the following particulars: for all counts, the identities of "each person or entity whom the government contends is an unindicted co-conspirator, aider and abettor, or other participant in the charged conduct," "the acts the government contends [the Defendant] personally performed, directed, authorized, caused or knowingly assisted, as distinguished from acts attributed solely to other participants," and "the transactions, payments, contracts, kickbacks and bribes, and claims the government contends formed part of the charged conspiracy, together with the allegedly unlawful or false feature of each"; and for Counts 2-4 and 6-10, "the conduct and principal actor underlying any reliance on 18 U.S.C. § 2, including whether the government contends [the Defendant] personally committed, aided and abetted, caused, or attempted to cause each charged transaction." *Id.* at 6. Attached to the Defendant's motion was a letter dated August 3, 2026, in which he requested additional information, including:

- Identifying information of all co-conspirators or "others" so that the defense could "investigate the individual";
- "Each and every contract" corresponding to the allegation that the Defendant, through Company 1, contracted with "sales representatives," including Alexandra Gehrke ("Gehrke");
- "Each and every" alleged kickback and bribe paid to sales representatives, including who paid and received the kickback, the manner of payment, the amount, the date, and the "precise acts" the Defendant is alleged to have performed;
- "Each and every" instance that the Defendant knew and intended that providers would conceal information from health care programs, including who sold and purchased the allografts, the volume sold, the purchase price, the price represented to Medicare or other health care programs, who made

the representation to Medicare or other health care programs, and the "precise acts" the Defendant is alleged to have performed;

- "Each and every 'sham' invoice," including who issued it, who authorized the issuance, who facilitated the issuance, to whom the invoice was issued, the date of issuance, the precise content of the invoice, and the "precise acts" the Defendant is alleged to have performed;
- "Each and every 'instruction'" to providers to use the sham invoices for Medicare reimbursement, including who made the instruction, to whom it was made, the manner and contents of the instruction, and the "precise acts" the Defendant is alleged to have performed;
- Information concerning the meeting attended by the Defendant and referenced in the Indictment, including the participants in the meeting, the date of the meeting, and the precise statements made during that meeting; and
- The identification of the sender of each wire transfer charged as overt acts in the Indictment, and the "precise act" the Defendant is alleged to have performed in relation to the wire.

*See* ECF No. 20-1.

On August 21, 2026, the government provided the Defendant with: (1) a list of twenty-four individuals and entities who the government considers to be co-conspirators (twelve of whom were separately charged in the District of Arizona and two others who were charged in the District of Nevada[2]); (2) the names of the individuals who attended the meeting referenced in paragraph 69(c) of the Indictment and the date of that meeting; and (3) notice that the government considers all claims for allografts distributed by Company 1 that were submitted to health care benefit programs by Apex Mobile Medical

---

[2] The charging documents for all fourteen of these individuals are publicly available, as are the plea agreements of the eleven of these fourteen defendants who have pled guilty.

LLC ("Apex Mobile") and APX Mobile Medical LLC ("APX") to be false and fraudulent, as well as all claims for allografts distributed by Company 1 that were submitted to health care benefit programs by all providers during their affiliation with Nugeneron JV LLC Series C01-14.[3]

The government is currently preparing over 5.7 million additional documents for production to the Defendant. Accompanying each production is a discovery log describing the categories of documents being produced, the source and type of document being produced, and the Bates ranges of each series of documents. Once this production is complete, the government will make itself available to conference with the Defendant regarding the contents of the government's productions.

## LEGAL STANDARDS

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charges against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Chenaur*, 552 F.2d 294, 301 (9th Cir. 1977) (quoting *Hamlin v. United States*, 418 U.S. 87, 117-18 (1973)).

Rule 7(f) gives the court discretion to "direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f). "A bill of particulars has three purposes: to apprise the defendant of the specific charges being presented so as to minimize surprise at trial, to aid the defendant in preparing for trial, and to protect against double jeopardy." *United States v. Burt*, 765 F.2d 1364, 1367 (9th Cir. 1985); *see also United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983); *United States v. Ayers*, 924 F.2d 1468, 1483-84 (9th Cir. 1991). "In determining if a bill of particulars should be ordered in a specific case, a court should consider whether the defendant has been advised adequately of the charges through the

[3] The Indictment refers to Nugeneron JV LLC as a "shell company" and its associated bank accounts as "pass-through" accounts. *See* ECF No. 3, ¶¶ 1, 50-51, 55-56.

indictment and all other disclosures made by the government." *Long*, 706 F.2d at 1054. "Full discovery will obviate the need for a bill of particulars." *Id*. (citing *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979)).

A defendant "is not entitled to know all the *evidence* the government intends to produce, but only the *theory* of the government's case." *United States v. Ryland*, 806 F.2d 941, 942 (9th Cir. 1986) (emphasis in original); *see also United States v. Kendall*, 665 F.2d 126, 135 (9th Cir. 1981) ("The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved."); *Salisbury*, 983 F.2d at 1375 (a bill of particulars is not meant as a tool for the defense to obtain detailed disclosure of all evidence held by the government before trial). The function of the bill of particulars "is not to provide a defendant with names of government witnesses," *Duke v. United States*, 255 F.2d 721, 729 (9th Cir. 1958), nor to "delineate all other overt acts that comprised the charged activity." *United States v. Dicesare*, 765 F.2d 890, 898 (1985). The denial of a motion for a bill of particulars is within the sound discretion of the district court. *Giese*, 597 F.2d at 1180.

## DEFENDANT'S REQUEST FOR A BILL OF PARTICULARS SHOULD BE DENIED

### 1. The Defendant's Motion for a Bill of Particulars is Premature.

The Defendant filed his motion for a bill of particulars on Sunday, August 9. The next day (and only eight business days after the protective order was issued), the government made its first production of over one million records to the Defendant. These materials primarily related to Gehrke, Jeffrey King ("King"), Apex Medical LLC ("Apex"), Viking Medical Consultants LLC (d/b/a Viking Medical Marketing) ("Viking"), Apex Mobile, and APX Mobile, all of which are identified as co-conspirators in the Indictment. The government produced these materials in a searchable and organized fashion intended to assist the Defendant with identifying the records of greatest importance and utility: all of the materials were produced in separately labeled subfolders (e.g., "interview reports," "medical records," "bank records"), and those that were

particularly voluminous were similarly organized but produced in a load-ready electronic format that could be uploaded by the Defendant to a document review platform and searched with key words of his choice. Included in this first discovery production were sixty-one interview reports, including interviews of co-conspirators who have pleaded guilty; search warrant affidavits; and plea agreements for three co-conspirators. The government's next production (which it expects to produce on or before August 28, 2026) will include approximately forty-eight additional interview reports, including those of co-conspirators; audio and video recordings of the meeting referenced in the Indictment; plea agreements for several additional co-conspirators; and additional search warrants and supporting affidavits, including the affidavit in support of a warrant to seize emails from the Defendant's Company 1 email account, among other Company 1 accounts.

The Ninth Circuit has held that among the factors a court should consider when determining whether a bill of particulars should be ordered is whether the defendant received full discovery, as the receipt of full discovery obviates the need for such information because the produced materials prevent the kind of surprise at trial that a bill of particulars is intended to guard against. *See Long*, 706 F.2d at 1054; *United States v. Grace*, 401 F. Supp. 2d 1103, 1119 (D. Mont. 2005) ("[T]he government's disclosure of full discovery renders the Defendants' fears of surprise surprisingly fearful.").

The Defendant's motion for a bill of particulars is premature, as he filed it before receiving any discovery whatsoever and without affording the government a reasonable amount of time to make and complete its productions. The produced materials will further clarify the government's theory of the case when reviewed and analyzed in conjunction with the lengthy and detailed speaking Indictment and the publicly available charging and plea documents of co-conspirators. The manner in which the materials are produced will enable the Defendant to easily identify specific categories of evidence relevant to the charged offenses and his potential defenses. Accordingly, because the information the Defendant seeks is contained in the discovery, the Defendant's motion should be denied.

**2. The Lengthy Speaking Indictment Adequately Advises the Defendant of the Charges Against Him and the Theory of the Government's Case.**

The 23-page speaking Indictment adequately advises the Defendant of the charges against him and the theory of the government's case.

Paragraph 1 of the Indictment provides a general summary of the alleged fraud. Specifically, it alleges that the Defendant, Vice Presidents of Sales for Company 1, and his co-conspirators used sham invoices and pass-through bank accounts associated with a shell company to conceal hundreds of millions of dollars in illegal kickbacks, bribes, and rebates that were paid to sales representatives and providers across the country to induce them to use the products sold by the Defendant's company (allografts). [ECF No. 3, ¶¶ 1, 2.] It further alleges that the Defendant and his co-conspirators lied to Medicare about the medical providers' actual acquisition cost of the allografts, which inflated Medicare's reimbursement for the products. *Id*. As a result of those unlawful financial inducements, sales representatives and providers caused medically unreasonable and unnecessary allografts to be applied to elderly and terminally ill patients. *Id*. Providers billed Medicare over $4 billion for Company 1's allografts, which "was not driven by medical necessity, but by an illegal kickback and bribery scheme that generated significant profits and lavish lifestyles" for participating sales representatives and providers. *Id*.

Paragraphs 2 through 10 identify and particularly describe the Defendant; Company 1; co-conspirators Gehrke, King, Apex Mobile, APX, Apex, and Viking; and "Provider 1," who is characterized as a "licensed medical doctor and resident of Los Angeles, California" and an "enrolled Medicare provider." *Id*., ¶¶ 2-10.

Paragraphs 11 through 31 describe the federal health care programs (Medicare, CHAMPVA, and TRICARE) and Commercial Insurers that reimbursed medical providers across the country who submitted allegedly false and fraudulent claims for Company 1 allografts. *Id*., ¶¶ 11-31.

Paragraphs 32-60—twenty-eight paragraphs over eight pages—set forth the allegations concerning Count 1 and include the purpose of the conspiracy and the manner

and means used by the Defendant and others to effect the objects of the conspiracy. *Id.*, ¶¶ 32-60. Specifically, the alleged Purpose of the Conspiracy, set forth in paragraph 33, was for the Defendant and his co-conspirators to unlawfully enrich themselves by, among other things, paying illegal kickbacks to sales representatives to induce the recommending and ordering of Company 1 allografts and the referral of patients to providers for the furnishing of Company 1 allografts; paying illegal kickbacks to providers to induce the purchasing and ordering of Company 1 allografts; causing the submission of fraudulent claims to Medicare that falsely represented the providers' actual acquisition cost of Company 1's allografts; causing the submission of false and fraudulent claims to federal health care programs and commercial insurers for items and services that were medically unnecessary, ineligible for reimbursement, and procured through kickbacks and bribes; and diverting the proceeds of the fraud for the personal use and benefit of the Defendant and his co-conspirators. *Id.*, ¶ 33.

The Manner and Means allegations are organized into five subsections that delineate the government's theories with respect to how the Defendant and his co-conspirators committed the fraud: (1) Paying Illegal Kickbacks to Sales Representatives; (2) Inducing Allograft Purchases with Rebates; (3) The Sham Invoice Scheme: Lying to Medicare About Providers' Actual Acquisition Cost of Company 1 Allografts and Concealing Illegal Kickbacks to Providers; (4) The Shell Company Scheme: Lying to Medicare About Providers' Actual Acquisition Cost of Company 1 Allografts and Concealing Illegal Kickbacks to Providers; and (5) Billing Medicare and Other Health Care Benefit Programs for Allografts there were Medically Unreasonable and Unnecessary. *Id.*, ¶¶ 32-60. Each header is supported with detailed corresponding allegations that further inform the Defendant of the nature of the charges against him. As examples, the Indictment alleges the specific kickback amounts that the Defendant, through Company 1, paid to specifically identified co-conspirators (*see id.*, ¶¶ 35-40); identifies specific documents and emails distributed by the Defendant in furtherance of the conspiracy (*see id.*, ¶¶ 44, 52); alleges that the Defendant entered into an illegal

agreement with specifically identified co-conspirators to conceal and disguise the alleged illegal kickback scheme and to circumvent Medicare reporting requirements (*see id.*, ¶ 55); and specifies the dollar amount of false and fraudulent claims submitted by specifically identified co-conspirators (*see id.*, ¶ 59).

Counts 2 through 4 charge substantive health care fraud. Each count identifies the approximate date of the fraudulent claim submission, the initials of the Medicare beneficiary for which the claim was submitted, the provider that submitted the allegedly fraudulent claim, and the approximate amount of the claim that the provider billed to Medicare. *Id.*, ¶¶ 61-65.

Count 5, which charges conspiracy to defraud the United States and to pay illegal kickbacks, alleges nine overt acts. Five of those overt acts relate to the payment of illegal kickbacks to co-conspirators Apex and APX, and each specifies the date, amount, and last four digits of the accounts associated with the transactions (*id.*, ¶ 69(d)-(i)). The other four overt acts include sufficient specificity to adequately apprise the Defendant of the alleged act and enable him to understand the government's theory of the charge: the overt act in paragraph 69(c) describes a meeting attended by the Defendant, a medical provider (anonymized as "Provider 1"), a Company 1 employee, and a Company 1 sales representative. This overt act not only includes the date and approximate location of the meeting, but also a statement alleged to have been made by the Defendant during the meeting in furtherance of the scheme.[4] Similarly, the overt act charged in paragraph 69(a) involves an email, and the overt act charged in paragraph 69(b) involves a text message, allegedly sent by the Defendant to co-conspirator Gehrke. Each of these allegations includes the date and substance of the communication: paragraph 69(a) indicates that the Defendant attached a spreadsheet to an email sent on December 8, 2021, that detailed the

---

[4] This particular overt act underscores why the particularized information sought by the Defendant is premature. On August 21, 2026, the government provided the Defendant with the names of those in attendance at this meeting, and an audio and visual recording of the meeting will be produced to the Defendant, which will elucidate those in attendance as well as the specific statements they made.

profits that Company 1 sales representatives and providers could make per allograft, and paragraph 69(b) identifies a July 1, 2023, text exchange between the Defendant and co-conspirator Gehrke in which the Defendant acknowledged and supported a contest in which the first sales representative to sell $10 million of Company 1 allografts received private airfare to a dinner in Las Vegas with Company 1 executives.

Counts 6 through 8 charge the offer and payment of kickbacks. *Id.*, ¶ 70. Each count identifies the approximate date of the transaction, the last four digits of the originating and receiving accounts, and the approximate dollar amount of the kickback.

Finally, Counts 9 and 10 charge transactional money laundering. *Id.*, ¶¶ 71-72. Each of those counts also identify the approximate date of the transaction, the last four digits of the originating account, a description of transaction, and the approximate dollar amount of the transaction.

As the Ninth Circuit stated in *Geise*, "[t]o the extent that the indictment or information itself provides details of the alleged offense, a bill of particulars is, of course, unnecessary." *Geise*, 597 F.2d at 1180 (citing 8 Moore's Federal Practice P 7.06(1) at 7-31 n.1 (2d ed. 1978)). The allegations in the Indictment provide the Defendant with a degree of detail that is more than sufficient to adequately apprise him of the government's theory of the case and the Defendant's alleged conduct, and his instant motion should therefore be denied.

**3. The Defendant's Request Seeks Information to Which He is Not Entitled.**

"The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *Kendall*, 665 F.2d at 135. Yet, that is precisely what the Defendant demands: specific information concerning how the government will prove its case. This is evident by the breadth and nature of his requests, which include the names and identifying information of every co-conspirator; the names of all government witnesses and the specific roles of each of those witnesses in the scheme; the specific acts that the Defendant "personally performed, directed, authorized, caused, or knowingly assisted"; all "contracts, payments, invoices, transactions,

kickbacks, or claims" the government contends were unlawful; and every "transaction[], payment[], kickback[] and bribe[], and claim[]" the government contends is fraudulent, "including the parties, approximate date, amount, and basis of the alleged falsity or kickback." [ECF No. 20 at 12, 15-17.][5]

The Defendant is already in possession of some of the requested information. On August 21, 2026, the government identified for the Defendant two dozen individuals and entities that it considers to be co-conspirators, and the Indictment itself specifically identifies several of them—Gehrke, King, Apex, Apex Mobile, Viking, and APX—all of whom are prominently featured in the Indictment's allegations to explain the mechanics of the conspiracy. As examples, the Indictment alleges the following:

- The Defendant, through Company 1, paid Gehrke, among other Company 1 sales representatives, illegal kickbacks to induce her and the other sales representatives to recommend and arrange for the purchasing of Company 1's allografts and to refer patients to providers for the furnishing of those allografts. ECF No. 3, ¶ 35-36.
- The Defendant knew that Gehrke, individually and through Apex and Viking, was Company 1's sales representative for Apex Mobile and APX

[5] The Defendant argues that he is entitled to this information because the Indictment does not allege a "single specific instance that [the Defendant] (i) had access to a single patient or patient file and (ii) directed a provider to bill for unnecessary services." [ECF No. 20 at 15]. In the Defendant's view, the absence of allegations concerning the Defendant's direct involvement in patient treatment or utterance of specific instructions to providers to bill for unnecessary services somehow renders him legally incapable of being involved in the charged conspiracy. Of course, that argument is predicated on a fundamental misunderstanding of conspiratorial liability, as "the government need not show direct contact or explicit agreement between the [co-conspirators]. It is sufficient to show that each [co-conspirator] knew or had reason to know the scope of the conspiracy and that each [co-conspirator] had reason to believe that [his] own benefits were dependent upon the success of the entire venture." *United States v. Arbelaez*, 719 F.2d 1453, 1459 (9th Cir. 1983) (quoting *United States v. Kostoff*, 585 F.2d 378, 380 (9th Cir. 1978)). Moreover, the suggestion that the government cannot prove its case is an argument more appropriately left for a jury to address rather than a justification for a bill of particulars.

Mobile, and knew that she contracted with sales representatives of her own to identify elderly Medicare patients with wounds, arrange for and recommend the ordering and purchasing of Company 1 allografts to be applied to those wounds, and refer the patients to Apex Mobile and APX Mobile, both of which were also controlled by Gehrke. *Id.*, ¶ 37-38.

- The Defendant, through Company 1, paid Gehrke over $271 million in illegal kickbacks based on the quantity and sizes of Company 1 allografts that Apex Mobile, APX, and other providers purchased from Company 1 and billed to Medicare. *Id.*, ¶ 40.
- The Defendant sent Gehrke marketing materials that highlighted the profits that providers could make by buying and using Company 1's products. *Id.*, ¶ 44.
- The Defendant entered into an illegal agreement with Gehrke and King to use a shell company and pass-through bank account to conceal and disguise the illegal kickback scheme. *Id.*, ¶ 55. APX received over $130 million in illegal kickbacks through this shell company and its associated pass-through bank account. *Id.*
- Apex Mobile and APX submitted over $1.2 billion in false and fraudulent claims to Medicare, TRICARE, CHAMPVA, and Commercial Insurers for Company 1's allografts and received over $614 million in reimbursements based on those claims. *Id.* ¶ 59.
- Counts 2 through 4 charge specific instances of health care fraud and all three Medicare beneficiaries were billed by APX. *Id.*, ¶ 65.
- And eight of the nine overt acts in paragraphs 69(a) through 69(i) involve Gehrke, Apex, or APX:
    - The Defendant emailed a spreadsheet to Gehrke, that calculated provider profits for various sizes of Company 1 allografts after Medicare reimbursement. *Id.*, ¶ 69(a).

- The Defendant received a text message from Gehrke, with two flyers promoting Apex's "Race to 10 Million Sales Contest" for Apex sales representatives which offered "private airfare" to Las Vegas to attend a dinner with Company 1 executives. The Defendant responded, "Looks great!" *Id.*, ¶ 69(b).
- The Defendant emailed Company 1 employees, copying Gehrke, informing them that Apex and Gehrke's commission would be increased to 60% on all new orders. *Id.*, ¶ (e).
- APX received illegal kickbacks from Company 1's shell bank account (identified in the Indictment as bank account ending in 3585) to APX's bank account ending in 7158. *Id.*, ¶ 69(d), (f), (g).
- Apex received illegal kickbacks from Company 1's bank account ending in 3813 to Apex's bank account ending in 9686. *Id.*, ¶ 69(h), (i).

The Defendant's requests for the "when, where, and how" of every act in furtherance of the conspiracy, as well as the identification of every witness, co-conspirator, document, payment, and claim, is "equivalent to a request for complete discovery of the government's evidence, which is not a purpose of the bill of particulars." *Geise*, 597 F.2d at 1181.

*United States v. Chen*, No. 09-CR-110, 2011 U.S. Dist. LEXIS 8455 (N.D. Cal. Jan. 29, 2011), is particularly instructive. In that case, the government charged two companies and nine individuals with a price-fixing conspiracy. *Id.* at *3. The indictment alleged that the conspirators in various combinations attended monthly meetings over the course of five years for the purpose of fixing the price of crystal display panels; issued price quotations in accordance with the price agreements and accepted payment at noncompetitive prices; discontinued group meetings and replaced them with one-on-one meetings on a certain date each month at restaurants and cafes in Taipei after learning of a possible investigation into the crystal display panel industry; exchanged shipment,

production, and pricing information in those meetings; and directed employees to obtain pricing information from crystal display manufacturers in the United States and report those findings to senior-level executives with one of the corporate defendants. *Id*. at *3-8. Both corporate defendants and four individual defendants moved for a bill of particulars, arguing that the indictment was "so conclusory and vague" that it was impossible for them to prepare an adequate defense, and emphasized that they should not be required to dig through the 42 million pages of discovery to discover the "missing details" of the government's allegations. *Id*. at *7, 14. The bill of particulars sought, among other things: the identities of co-conspirators; specific locations where the conspiracy functioned, where conspiratorial meetings took place, and what conspiratorial acts and statements were made; the overt acts engaged in by the participants of the conspiracy; information about customers (including names, specific products purchased, and countries where the products were sold); and information about the "price quotations" mentioned in the indictment, including what the prices were, when the quotations were issued, which products the quotations covered, which of the quotations the defendants were aware of, and when the defendants became aware. *Id*. at *15.

The court in *Chen* determined that the defendants were not entitled to a bill of particulars, stating: "The indictment adequately advise[d] defendants of the charges against them, and defendants s[ought] extremely detailed evidence to which they are not entitled . . .," and "[a] bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government's investigation. Rather, it is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his *own* investigation." *Id*. (emphasis in original) (quoting *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985)). The court noted that the indictment included a "description of the goals of the conspiracy, as well as a detailed description of the means and methods by which those goals were to be accomplished," and found it to be "far more detailed" than other indictments found by the Ninth Circuit to be sufficient. *Id*. at *20-21 (citing *United States v. Miller*, 771 F.2d 1219, 1226-27 (9th Cir. 1985)).

Notably, the court also found that although the discovery was voluminous, the timing and manner in which discovery was provided to the defendants obviated the need for a bill of particulars; specifically, the court highlighted its organization (the discovery was indexed, searchable, and "provided in a fashion designed to help defendants prepare their case"), the timing ("the government began producing discovery as soon as the defendants and the Court signed a protective order"), and the substance (the discovery included approximately 87 detailed interview reports). *Id*. at *22-23.

The instant matter presents a factually analogous situation. The Defendant is charged with a multi-year conspiracy designed to maximize profits through the manipulation of the cost of goods. The Defendant claims that the allegations in the Indictment, which are significantly more detailed than in *Chen* and also describe the conspiracy's goals and its means and methods, prevent him from preparing an adequate defense. And in both cases, the government's discovery was voluminous (though the 42 million records in *Chen* is almost six times the volume expected to be produced to the Defendant here) and productions began once a protective order was in place. Additionally, the discovery here includes search warrant affidavits and dozens of detailed interview reports, including those of identified co-conspirators—in fact, the government will have produced more detailed interview reports in its first two productions than had been produced in *Chen*—and the discovery produced to the Defendant is organized, indexed, and searchable. Additionally, as in *Chen*, the Defendant has been aware of the charges and core evidence against him based on the publicly available filings in related criminal cases.

Separately, the Defendant's requests for "each and every" contract, invoice, instruction, kickback, bribe, and instance where the Defendant knew and intended that the provider would misrepresent the actual cost of Company 1 allografts in their claims is unreasonable and overly burdensome given the magnitude of the charged conspiracy. Company 1 was a multi-billion-dollar company that sold allografts to almost two thousand individual practitioners and medical practices throughout the country. Between December 2021 and June 2024, Company 1 allografts were applied to over 13,000 Medicare

beneficiaries and over 114,000 claims were submitted by providers to Medicare for those allografts and related services. Producing the hyper-specific and granular information requested by the Defendant is not only unreasonable but also unnecessary, both in terms of what is required to prove a conspiracy and what is needed by the Defendant to prepare a defense. *See generally United States v. Bin Laden*, 92 F. Supp. 2d 225, 243 (S.D.N.Y. 2000) (requiring the government to provide a bill of particulars concerning the way in which the Defendant's acts furthered the overall objective of a uniquely broad conspiracy involving a large number of people performing disparate tasks would be unduly burdensome and unnecessary to defendants' preparation).

In both *United States v. Windley*, No. CR-10-660, 2012 WL 2813859 (D. Ariz. July 10, 2012) and *United States v. Muhammed*, *et al.*, No. CR-12-01973, 2013 WL 5200117 (D. Ariz. Sep. 16, 2013), this Court was presented with requests for bills of particulars that directed the government to produce more information than the defendants were entitled to. In *Windley*, the defendant sought the identification of "all" co-conspirators, victims, and locations of the charged offenses, *Windley*, 2012 WL 2813859, at *4, and in *Muhammed*, a 39-count robbery and drug conspiracy case, the defendants sought, among other information, the identity of unnamed co-conspirators and witnesses, identities of uncharged persons who may be involved in each substantive count, and the nature and circumstances of each defendant's participation. *Muhammed*, 2013 WL 520017 at * 2. In both cases, this Court partially granted the requests but limited the government's disclosure to information necessary to enable the defendant to effectively prepare for trial. In *Windley*, the government was directed to identify the co-conspirators, victims, and locations "it intend[ed] to identify at trial that [were] not mentioned in the Superseding Indictment," *Windley*, 2012 WL 2813859, at *4, and in *Muhammed*, the government was directed to divulge the precise dates for the substantive counts that did not include them, and the names of the victims for the Hobbs Act robbery and related firearms counts. *Muhammed*, 2013 WL 520017 at * 2. This Court noted that the other more detailed information requested was "not necessary to advise the defendant of the nature and cause

of the accusation in order that he may meet it and prepare for trial, and after judgment be able to plead the record and judgment in bar of a further prosecution for the same offense." *Id*. at 4 (quoting *Wong Tai v. United States*, 273 U.S. 77, 80-81 (1927)).

The government is seeking the same resolution here. The Indictment identifies approximate date ranges (month and year) for the conspiracy charges and a specific date of each substantive count and overt act, and describes with particularity the nature of the charged conduct and the Defendant's role in it. The Defendant has had notice of the government's core theories based on the public charging and plea documents filed against numerous co-conspirators as well as the voluminous but highly organized and searchable discovery that has been and will be produced in short order that includes hundreds of detailed interview reports, including those of co-conspirators identified in the Indictment and separately by the government, as well as search warrant affidavits, emails sent to and from the Defendant, and recordings of the Defendant. Moreover, the specific information requested by the Defendant is well beyond what he is entitled to.

## **CONCLUSION**

For the reasons stated above, the government respectfully requests that the Defendant's motion for a bill of particulars be denied.

TIMOTHY COURCHAINE

United States Attorney
District of Arizona

*s/Matthew Williams*
MATTHEW WILLIAMS
Assistant U.S. Attorney

COLIN M. MCDONALD
Assistant Attorney General
National Fraud Enforcement Division
U.S. Department of Justice

*s/ Shane Butland*
SHANE BUTLAND

WILLIAM HOCHUL III
Trial Attorneys
Health Care Fraud Section
National Fraud Enforcement Division
U.S. Department of Justice

**CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of August, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrants:

Louis J. Manzo, Esq.
Helen Hitz, Esq.
Mark Samuel Kokanovich, Esq.
Counsel for Brian Rowan

*s/ Shane Butland*
SHANE BUTLAND
Trial Attorney
Health Care Fraud Section
National Fraud Enforcement Division
U.S. Department of Justice