Louis J. Manzo (*pro hac vice*)
LManzo@bdlaw.com
BEVERIDGE & DIAMOND PC
1900 N Street, NW, Suite 100
Washington, DC 20036
Telephone: (202) 789-6000
Facsimile: (202) 789-6190

Mark S. Kokanovich (SBN 021168)
kokanovichm@ballardspahr.com
Helen Hitz (SBN 039579)
hitzh@ballardspahr.com
BALLARD SPAHR LLP
1 E Washington Street, Suite 2300
Phoenix, AZ 85004
Telephone: (602) 798-5400
Facsimile: (602) 798-5595

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Brian Rowan,<br><br>Defendant. | Case No. 26-CR-00660-PHX-DGC (MTM)<br><br>**MOTION FOR DISCLOSURE OF GRAND JURY MATERIALS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DISCLOSURE OF GRAND JURY MATERIALS**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

I. MOTION ........ 1
II. MEMORANDUM OF POINTS AND AUTHORITIES ........ 1
A. Introduction ........ 1
B. Legal Standard ........ 2
C. Background ........ 2
D. Argument ........ 4
1. The Court should disclose the legal instructions given to the grand jury or, in the alternative, review them *in camera*. ........ 4
2. Mr. Rowan is entitled to grand jury witness transcripts under Rule 6(e) ........ 7
E. Conclusion ........ 16

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bank of Nova Scotia v. United States*,
487 U.S. 250 (1988) .................................... 7, 8, 11

*Braverman v. United States*,
317 U.S. 49 (1942) .................................... 14

*Dennis v. United States*,
384 U.S. 855 (1966) .................................... 2

*In re Grand Jury Proc.*,
62 F.3d 1175 (9th Cir. 1995) .................................... 16

*In re Special Grand Jury (for Anchorage, Alaska)*,
674 F.2d 778 (9th Cir. 1982) .................................... 4

*Kotteakos v. United States*,
328 U.S. 750 (1946) .................................... 6

*United States v. Ahmed*,
No. 1:25-CR-00321-1, 2026 WL 2056861 (N.D. Ill. July 16, 2026) .................................... 8

*United States v. Alter*,
482 F.2d 1016 (9th Cir. 1973) .................................... 2, 4

*United States v. Basurto*,
497 F.2d 781 (9th Cir. 1974) .................................... 14

*United States v. Belton*,
No. 14-CR-00030-JST, 2015 WL 1815273 (N.D. Cal. Apr. 21, 2015) .................................... 4

*United States v. Bendis*,
681 F.2d 561 (9th Cir. 1982) .................................... 14

*United States v. Carona*,
No. SACR 06-0224 AG, 2008 WL 1970205 (C.D. Cal. May 2, 2008) .................................... 7

*United States v. Carroll*,
320 F. Supp. 2d 748 (S.D. Ill. 2004) .................................... 7

*United States v. Comey*,
809 F. Supp. 3d 396 (E.D. Va. 2025) ........ 11

*United States v. Diaz*,
236 F.R.D. 470 (N.D. Cal. 2006) ........ 4, 15

*United States v. Dipentino*,
242 F.3d 1090 (9th Cir. 2001) ........ 13

*United States v. Duran*,
189 F.3d 1071 (9th Cir. 1999) ........ 6

*United States v. Fischbach & Moore, Inc.*,
776 F.2d 839 (9th Cir. 1985) ........ 12

*United States v. Lennick*,
18 F.3d 814 (9th Cir. 1994) ........ 8, 9

*United States v. Luong*,
965 F.3d 973 (9th Cir. 2020) ........ 14

*United States v. Mahoney*,
495 F. Supp. 1270 (E.D. Pa. 1980) ........ 11

*United States v. Marchetti*,
96 F.4th 818 (5th Cir. 2024) ........ 6

*United States v. Navarro*,
608 F.3d 529 (9th Cir. 2010) ........ 8, 14

*United States v. Plummer*,
941 F.2d 799 (9th Cir. 1991) ........ 2, 7, 15

*United States v. Pokorny*,
No. 26-CR-00018-JST-1, 2026 WL 1270616 (N.D. Cal. May 8, 2026) ........ 5

*United States v. Powell*,
No. 22-cr-00003-JSW-1, 2024 WL 3052966 (N.D. Cal. June 18, 2024) ........ 5

*United States v. Reid*,
477 F. Supp. 3d 1174 (W.D. Wash. 2020) ........ 2, 8, 16

*United States v. Rosendin Elec., Inc.*,
122 F.R.D. 219 (N.D. Cal. 1987) ........ 15

*United States v. Samango*,
607 F.2d 877 (9th Cir. 1979) .......... 7, 12, 15

*United States v. Schena*,
142 F.4th 1217 (9th Cir. 2025) .......... 6

*United States v. Shaw*,
106 F. Supp. 2d 103 (D. Mass. 2000) .......... 7

*United States v. Sorensen*,
134 F.4th 493 (7th Cir. 2025) .......... 6

*United States v. Star*,
470 F.2d 1214 (9th Cir. 1972) .......... 12

*United States v. Stevens*,
771 F. Supp. 2d 556 (D. Md. 2011) .......... 7

*United States v. Ward*,
747 F.3d 1184 (9th Cir. 2014) .......... 12, 13

*United States v. Way*,
No. 1:14-CR-00101(DAD)(BAM), 2015 WL 8780540 (E.D. Cal. Dec. 15, 2015) .......... 5

*United States v. Weinstein*,
No. CR-25-00541-001-PHX-DJH, 2025 WL 1884247 (D. Ariz. July 8, 2025) .......... 15

*United States v. Williams*,
504 U.S. 36 (1992) .......... 14

**STATUTES**

18 U.S.C. § 371 .......... 5
18 U.S.C. § 1349 .......... 5
18 U.S.C. § 3161(h)(1)(D) .......... 1
42 U.S.C. § 1320a-7b(b)(3)(A) .......... 6

**RULES**

Fed. R. Crim. P. 6 .......... 1
Fed. R. Crim. P. 6(e) .......... 2, 4
Fed. R. Crim. P. 6(e)(3)(E)(i) .......... 2, 15
Fed. R. Crim. P. 6(e)(3)(E)(ii) .......... 2, 15

**REGULATIONS**

42 C.F.R. § 1001.952(a)(2) .......... 6
42 C.F.R. § 1001.952(h) .......... 6
*Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions*, 56 Fed. Reg. 35952 (July 29, 1991) .......... 6

**OTHER**

Press Release, U.S. Dep't of Just., U.S. Att'y's Off. for the Dist. of Ariz., *District of Arizona Announces Charges Involving Over $1.2 Billion in False or Fraudulent Claims as Part of National Health Care Fraud Takedown* (June 23, 2026) .......... 6

Statement of Glenn Grothman, Chairman, Subcomm. on Health Care & Fin. Servs., H. Comm. on Oversight & Gov't Reform, *Medicare Fraud: Examining the Explosive Growth in Skin Substitute Spending* (July 21, 2026) .......... 2

U.S. Dep't of Health & Hum. Servs., Off. of Inspector Gen., OEI-BL-24-00420, *Medicare Part B Payment Trends for Skin Substitutes Raise Major Concerns About Fraud, Waste, and Abuse* (Sept. 2025) .......... 2

U.S. Dep't of Just., Just. Manual § 9-11.233 (2026) .......... 15

## I. MOTION

Defendant Brian Rowan, by and through his undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 6, respectfully moves this Court for an Order directing the disclosure of grand jury materials in this matter. Specifically, based upon the facts set forth below, Mr. Rowan seeks transcripts of all:

- instructions given to the grand jury;
- testimony of cooperating witnesses likely to testify at trial; and
- testimony of law enforcement.

Excludable delay under 18 U.S.C. § 3161(h)(1)(D) will occur as a result of this motion or of an order based thereon. Mr. Rowan respectfully requests oral argument on this motion to be scheduled on October 13, 2026, when the parties will already be convening.

## II. MEMORANDUM OF POINTS AND AUTHORITIES

### A. Introduction

Mr. Rowan seeks grand jury materials because the Indictment and initial discovery raise serious questions about whether the grand jury was properly instructed and whether the Government's presentation materially distorted the case against him. Counts 1 and 5 charge different conspiracy offenses, yet the Government supports both with substantially the same sweeping allegations concerning sales commissions, provider rebates and invoicing, a series-LLC arrangement, and medically unnecessary treatment, and often attributes conduct collectively to "[Mr.] Rowan, through Company 1, and others." Those allegations implicate different legal rules, and criminal liability depends on Mr. Rowan's own agreement and intent to join each of the alleged conspiracies. Without careful instructions, the grand jury may have indicted him for lawful conduct or for others' misconduct. Separately, as to the specific acts attributed to Mr. Rowan, initial discovery reveals material context and exculpatory evidence already in the Government's possession that substantially alters the meaning the Indictment assigns to those acts and requires examination of how the alleged acts were presented to the grand jury. The requested materials are necessary to determine whether material legal or factual defects infected the proceedings and warrant dismissal.

**B. Legal Standard**

Although the grand jury typically operates in secrecy, defendants are entitled to review materials upon direction of the Court. *See Dennis v. United States*, 384 U.S. 855, 869-70 (1966) (confirming "the trial court's power under Rule 6(e) of the Federal Rules of Criminal Procedure to direct disclosure of grand jury testimony"). The rules governing the disclosure of materials depend on the subject matter. Instructions to the grand jury are not secret. *See United States v. Alter*, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) (defendant "entitled to know the content of the court's charges to the grand jury"). Testimony before the grand jury has more significant strictures. Under Federal Rule of Criminal Procedure 6(e)(3)(E)(i) and (ii), a court may order the disclosure of grand jury materials "preliminarily to or in connection with a judicial proceeding" or "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." The defendant must show a "particularized need" for the material sought. *United States v. Reid*, 477 F. Supp. 3d 1174, 1185 (W.D. Wash. 2020) (quoting *Dennis*, 384 U.S. at 870). To determine whether a particularized need exists, a court must find: "(1) that the desired material will avoid a possible injustice, (2) that the need for disclosure is greater than the need for continued secrecy, and (3) that only relevant parts of the transcripts should be disclosed." *Reid*, 477 F. Supp. 3d at 1185 (quoting *United States v. Plummer*, 941 F.2d 799, 806 (9th Cir. 1991)). Each of these factors is present in this case, as set forth below.

**C. Background**

Mr. Rowan was indicted among highly publicized federal efforts to curb an industry-wide rise in Medicare spending on amniotic allografts, or "skin substitutes." That spending increased from approximately $200 million in 2019 to more than $10 billion in 2024 and reportedly exceeded $14 billion in 2025. U.S. Dep't of Health & Hum. Servs., Off. of Inspector Gen., OEI-BL-24-00420, *Medicare Part B Payment Trends for Skin Substitutes Raise Major Concerns About Fraud, Waste, and Abuse*, at 1 (Sept. 2025) ("Medicare Payment Trends"); Statement of Glenn Grothman, Chairman, Subcomm. on Health Care & Fin. Servs., H. Comm. on Oversight & Gov't Reform, *Medicare Fraud: Examining the Explosive Growth in Skin*

*Substitute Spending* (July 21, 2026). The Government likewise announced Mr. Rowan's prosecution as part of its highly publicized June 2026 National Health Care Fraud Takedown. *See* Press Release, U.S. Dep't of Just., U.S. Att'y's Off. for the Dist. of Ariz., *District of Arizona Announces Charges Involving Over $1.2 Billion in False or Fraudulent Claims as Part of National Health Care Fraud Takedown* (June 23, 2026).

Company 1's allografts were one part of that much broader market growth. The Indictment alleges that, from approximately December 2021 through June 2024, providers billed federal health care programs more than $4 billion for Company 1's allografts and received more than $2 billion in reimbursement. The Indictment then asserts that a "significant spike" in claims for Company 1's products was caused by alleged interweaving kickback and bribery schemes involving Mr. Rowan. Indictment, ECF No. 3, ¶ 1.

But the industry-wide growth encompassed much more than Company 1's sales. In September 2025, the Health and Human Services Office of Inspector General ("HHS-OIG") reported that the dramatic growth in allograft reimbursements may have reflected some potential fraud, waste, and abuse, but also a policy choice by the federal government where the government created a payment system that encouraged the use of higher-priced products and allowed providers to retain the difference between Medicare reimbursement and their acquisition cost. Medicare Payment Trends, at 1-3. Industry spending also continued to rise substantially after the conspiracy alleged against Mr. Rowan ended in June 2024. In that context, Company 1's sales and downstream medical providers' reimbursement claims cannot be so cleanly attributed to wrongdoing as the Indictment suggests.

More importantly for this Motion, the limited discovery produced to date raises concrete questions about how the Government presented its evidence concerning Mr. Rowan to the grand jury. As discussed below, the Indictment quotes only one statement as an overt act by Mr. Rowan, *see* Indictment ¶ 69(c), but discovery has shown that Mr. Rowan was not discussing the charged conspiracy when he made that cherry-picked statement during a secretly recorded, three-hour-long meeting. The Indictment likewise identifies Mr. Rowan's sending of a spreadsheet concerning rebates and commissions to Ms. Alexandra Gehrke as an overt act,

*id.* ¶ 69(a), although Ms. Gehrke later told prosecutors that Mr. Rowan instructed her not to show that information to providers or "sell the spread." And Ms. Gehrke—who admitted her own intent to defraud federal health care programs in a plea agreement with the Government—told the Government that she did not think Mr. Rowan "set out to defraud the federal government." Contemporaneous evidence during the alleged conspiracy confirms Ms. Gehrke's statement: when an apparent instance of improper grafting came to Mr. Rowan's attention, he raised the concern to Ms. Gehrke and Ms. Gehrke told Mr. Rowan that the provider practice was taking corrective action.

Those examples, addressed in detail below, provide a basis to examine the grand jury proceedings. They concern evidence already in the Government's possession that bears directly on the meaning of conduct quoted or described in the Indictment, Mr. Rowan's knowledge and intent, and the existence of the criminal agreements the Government alleges. They therefore frame both aspects of the relief sought here: disclosure of the legal instructions given to the grand jury and disclosure of the testimony through which the Government presented its case against Mr. Rowan.

## D. Argument

### 1. The Court should disclose the legal instructions given to the grand jury or, in the alternative, review them *in camera*.

Rule 6(e) protects "matter[s] occurring before the grand jury," but legal instructions do not invariably disclose such matters. The Ninth Circuit has unambiguously stated that while grand jury proceedings are secret, "the ground rules by which the grand jury conducts those proceedings are not." *Alter*, 482 F.2d at 1029 n.21; *see also In re Special Grand Jury (for Anchorage, Alaska)*, 674 F.2d 778, 779-80 n.1 (9th Cir. 1982) (distinguishing "ministerial records" of a grand jury from "records which relate to the substance"). Applying that distinction, district courts in this Circuit have ordered disclosure of legal instructions that would not reveal the evidence, testimony, or deliberations before the grand jury. *See United States v. Diaz*, 236 F.R.D. 470, 477-78 (N.D. Cal. 2006) (permitting disclosure of "all instructions given to the grand jury"); *United States v. Belton*, No. 14-CR-00030-JST, 2015

WL 1815273, at *3 (N.D. Cal. Apr. 21, 2015) (defendant "entitled to disclosure . . . even without a showing of particularized need"). Because particular instructions may be intertwined with the Government's presentation of the evidence, the Court may alternatively review the instructions *in camera* and disclose the portions stating the governing law. *See United States v. Pokorny*, No. 26-CR-00018-JST-1, 2026 WL 1270616, at *8 (N.D. Cal. May 8, 2026), and *United States v. Powell*, No. 22-cr-00003-JSW-1, 2024 WL 3052966, at *3 (N.D. Cal. June 18, 2024) (both courts ultimately disclosed the grand jury instructions). "[O]n balance, the need for disclosure [of legal instructions] outweighs the need for secrecy." *United States v. Way*, No. 1:14-CR-00101(DAD)(BAM), 2015 WL 8780540, at *6 (E.D. Cal. Dec. 15, 2015).

Even if Mr. Rowan were required to demonstrate particularized need, the Indictment's structure supplies it. The Government relies on the same sweeping factual allegations to support two separate conspiracy counts. Count 1 alleges that Mr. Rowan conspired to commit wire fraud and health care fraud in violation of 18 U.S.C. § 1349. Indictment, ECF No. 3, ¶ 32. Count 5 separately alleges that Mr. Rowan conspired to defraud the United States and to offer and pay illegal health care kickbacks in violation of 18 U.S.C. § 371. *Id.* ¶ 66. Count 5 incorporates the same alleged purpose and manner and means pleaded for Count 1 and alleges a series of overt acts. *Id.* ¶¶ 33-34, 67-69. The two counts thus rest on overlapping allegations but involve different statutory objects, elements, and mental states.

In turn, the incorporated allegations span four distinct factual scenarios that implicate hundreds of individual actors across the United States: commissions paid to sales representatives, rebates paid to providers, the alleged "shell company" arrangement, and medically unnecessary treatment. *Id.* ¶¶ 35-60. They also alternate between allegations directed specifically at other actors and allegations pleaded collectively against "BRIAN ROWAN, through Company 1, and others." For example, the Indictment attributes the targeting of elderly patients and the ordering of disproportionately large allografts directly to Ms. Gehrke and Mr. Jeffrey King. *Id.* ¶ 39. Elsewhere, it alleges collectively that Mr. Rowan, Company 1, "and others" paid commissions, authorized rebates, issued invoices, and implemented the alleged shell company arrangement. *Id.* ¶¶ 35-36, 40-56.

Those allegations make Mr. Rowan's agreement and intent central to the instructions. A common participant does not convert otherwise separate arrangements into one overarching conspiracy; a single conspiracy requires an "overall agreement" and evidence that "each defendant knew, or had reason to know, . . . that his benefits were probably dependent upon the success of the entire operation." *United States v. Duran*, 189 F.3d 1071, 1080 (9th Cir. 1999); *see also Kotteakos v. United States*, 328 U.S. 750, 773 (1946). Participation in one transaction or commercial arrangement does not, without more, establish that Mr. Rowan knowingly joined every agreement encompassed by the Indictment. The grand jury therefore had to assess his knowing participation in the conspiracy charges in each count.

The legal character of the alleged arrangements reinforces the need for disclosure. HHS-OIG has explained that failure to satisfy a safe harbor does not itself determine whether an arrangement violates the Anti-Kickback Statute ("AKS"); instead, legality depends on the statutory prohibition and the particular facts and intent. *Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions*, 56 Fed. Reg. 35952, 35954-55 (July 29, 1991) (final rule). OIG has also expressly rejected the proposition that percentage contracts based on overall volume are *per se* violations. *Id.* at 35973; *accord United States v. Marchetti*, 96 F.4th 818, 826-27, 831 (5th Cir. 2024) (contract structure alone is insufficient); *United States v. Sorensen*, 134 F.4th 493, 502 (7th Cir. 2025) (same); *cf. United States v. Schena*, 142 F.4th 1217, 1225 (9th Cir. 2025) (relying on AKS precedent to hold that percentage-based compensation for marketing agents, without more, does not violate EKRA's analogous prohibition on payments "to induce" referrals). Federal law also expressly protects qualifying discounts and returns on investment interests. *See* 42 U.S.C. § 1320a-7b(b)(3)(A); 42 C.F.R. § 1001.952(a)(2), (h). Those authorities do not resolve whether the particular arrangements alleged here were lawful, but they show that terms such as "commission," "rebate," and "joint venture" do not themselves establish a crime. Criminal liability turns on the arrangement's actual purpose and Mr. Rowan's own knowledge and intent.

The fraud allegations require the same individualized analysis. The submission of an inaccurate or medically unnecessary claim by a provider does not alone establish that Mr.

Rowan agreed that the claim would be submitted or possessed the intent required for wire fraud or health care fraud. Yet the Indictment incorporates the provider conduct into both conspiracy counts while alleging much of Mr. Rowan's conduct collectively with Company 1 and unidentified "others."

Disclosure will allow the defense and the Court to determine whether the Government's instructions correctly distinguished Counts 1 and 5, accurately explained what it had to prove under each theory charged in those counts, and required probable cause that Mr. Rowan joined each charged conspiracy with the necessary intent. It will also show whether broad allegations about Company 1 and others substituted for the required probable cause determination about Mr. Rowan himself. An incorrect instruction may warrant dismissal if it substantially influenced the grand jury's decision to indict or leaves grave doubt that the decision was free from that influence. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988); *see United States v. Stevens*, 771 F. Supp. 2d 556, 566-68 (D. Md. 2011) (dismissing indictment without prejudice after *in camera* review revealed an erroneous instruction bearing on intent). Scrutiny is especially warranted because criminal precedent on two of the Government's central theories is unusually sparse: the defense has identified only two reported criminal decisions addressing the AKS's discount protections and no published criminal decision applying the small-entity investment safe harbor to a provider-investor joint venture. *See United States v. Shaw*, 106 F. Supp. 2d 103, 113-18 (D. Mass. 2000); *United States v. Carroll*, 320 F. Supp. 2d 748, 756-58 (S.D. Ill. 2004).

**2. Mr. Rowan is entitled to grand jury witness transcripts under Rule 6(e).**

Mr. Rowan's request for grand jury witness transcripts satisfies the *Plummer* particularized need standard. *See Plummer*, 941 F.2d at 806. "[P]articularized need can arise in the context of 'unfair or improper prosecutorial conduct.'" *United States v. Carona*, No. SACR 06-0224 AG, 2008 WL 1970205, at *2 (C.D. Cal. May 2, 2008) (quoting *United States v. Samango,* 607 F.2d 877, 881 (9th Cir. 1979)). Although the defense's asserted need cannot be merely speculative, courts have ordered disclosure of grand jury materials when such material

is necessary for the defendant to support a motion to dismiss. *See, e.g.*, *Reid*, 477 F. Supp. 3d at 1185 ("If evidence showing prejudice exists, the only way Ms. Reid will obtain it is if the court authorizes disclosure of the grand jury materials."); *United States v. Ahmed*, No. 1:25-CR-00321-1, 2026 WL 2056861, at *5 (N.D. Ill. July 16, 2026) (court may order disclosure of grand jury transcripts to establish misconduct even if court denies dismissal).

**a. Disclosure of the materials will help to avoid a possible injustice.**

The risk of injustice for Mr. Rowan in this case is high because: (1) the face of the Indictment and the limited discovery received to date raise a non-speculative concern that the Government misrepresented evidence; (2) grand juries in multiple jurisdictions are still independently investigating and collecting materials *central* to Mr. Rowan's Indictment and it is unclear what evidence the Arizona grand jury was privy to prior to being asked for a vote to indict Mr. Rowan; (3) this Indictment allows the Government to constructively amend its case at trial and creates significant double jeopardy exposure for Mr. Rowan; and (4) the evidence presented counsels in favor of verification of the Department's conduct before the grand jury.

**i. Discovery suggests the Government misled the grand jury.**

A misleading or inaccurate statement to the grand jury will warrant dismissal if it "substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *United States v. Navarro*, 608 F.3d 529, 539 (9th Cir. 2010) (quoting *Bank of Nova Scotia*, 487 U.S. at 256). The limited discovery received to date raises concerns that the grand jury's decision to indict was substantially influenced by mischaracterizations and an incomplete presentation of the Government's own evidence, which would warrant dismissal.

First, and most blatantly, the Indictment itself indicates the grand jury did not receive the full picture of the Government's evidence related to statements of likely cooperators and co-conspirators. Conspiracy requires "that at least two persons had an agreement . . . to accomplish an illegal objective." *United States v. Lennick*, 18 F.3d 814, 818 (9th Cir. 1994). The Government's own interview memos, from interviews with its most important cooperating

witness, Ms. Gehrke, render this theory impossible. Ms. Gehrke, who has pled guilty and admitted that her intent was to defraud the federal government, informed the same federal government that she "d[id] not think that [Mr. Rowan] set out to defraud the federal government." Exhibit 1 at 3 (U.S. Dep't of Health & Hum. Servs., Off. of Inspector Gen., *Report of Interview: Alexandra Gehrke* (Feb. 25, 2025), INT_001179). If Mr. Rowan had a different intent than Ms. Gehrke, there is no agreement and no conspiracy.

Ms. Gehrke's statement is fully supported by both contemporaneous documentation and Ms. Gehrke's own recounting of events. Importantly, regarding the alleged fraud due to lack of medical necessity, the Government and Mr. Rowan agree that Mr. Rowan never saw patients or patient files, and that providers submitted their own claims wholly independent of Mr. Rowan. *See* Gov't's Resp. in Opp'n to Def.'s Mot. for Bill of Particulars 13 n.5, ECF No. 28. The Government's theory seems to hinge on an unidentified fabric of spoken or unspoken agreements between unknown people connecting Mr. Rowan to the provider who submitted the false claims. Problematically for the Government's narrative, the facts are otherwise. When Mr. Rowan became aware of potentially problematic conduct by a provider who purchased products from Ms. Gehrke, he took independent action to inform Ms. Gehrke of his concerns.

For example, on February 2, 2024, Mr. Rowan received a picture of a wound that appeared to be overwrapped with potentially unnecessary allografts. Exhibit 2. Although (i) Mr. Rowan is not a provider; (ii) providers make their own medical determinations and are required by their contracts with Company 1 to use their own medical judgment; and (iii) providers certify to Medicare that their treatments are medically necessary when they submit their claims to Medicare, Mr. Rowan took immediate action in response to this photograph because the image appeared inconsistent with what he believed was proper treatment based on his experience in the wound care industry. Following receipt of the image, Mr. Rowan immediately contacted Ms. Gehrke, who had sold the Company 1 products at issue to the provider. The same day, Ms. Gehrke sent a message to Mr. Rowan stating that she had scheduled an office staff meeting, that she scheduled provider training, and that the medical director of the clinic was conducting an internal audit on the nurse practitioner who had

applied the grafts. Exhibit 3. Later, on February 6, 2024, Ms. Gehrke wrote to Mr. Rowan to say that she was "working on the issue" and that she would "have a big meeting so this never happens again." *Id*. She also stated that she was "aware of the severity of the issue" and was "doing all I can to educate and correct it." *Id*.

If Mr. Rowan were conspiring with providers and Ms. Gehrke to cause the submission of medically unnecessary false claims, why would he be taking the exact opposite actions, which would prevent the submission of false claims? Coupled with the indisputable fact that treating physicians, and not sales executives at wholesale distribution companies selling healthcare products to other distributors, are solely responsible for medical necessity judgments, this evidence suggests that the Government failed to provide the grand jury with a complete presentation of evidence. Given the existence of evidence directly contradictory to the Government's theory and the potential that the Government misled the grand jury, disclosure of grand jury materials is appropriate here.

Next, the Indictment alleges, as one of the limited number of overt acts actually related to Mr. Rowan, that during a secretly recorded meeting with "Provider 1, a Company 1 employee, and a Company 1 sales representative," Mr. Rowan stated that "even though you make money off of [Company 1 allografts], OIG [Office of Inspector General] and DOJ [Department of Justice], they don't want you to ever acknowledge you're making money off it . . . ." Indictment, ECF No. 3, ¶ 69(c) (alterations in original). Reading the Indictment, one would think that Mr. Rowan was instructing others to conceal information from the federal Government. However, we now know from the limited discovery produced by the Government to date that the Government *egregiously* took this statement out of context.

Nearly three hours into the secretly recorded conversation, Mr. Rowan utters the 23-word statement quoted in the Indictment. This one statement is cherry-picked and, in context, concerns an entirely different subject *unrelated to charged conduct*. In this portion of the conversation, Provider 1 tells Mr. Rowan that he wants to put together a presentation for his friends *to invest in a new clinic* and asks for pricing examples from Noridian. Mr. Rowan then makes the quoted statement: "even though you make money off of it, OIG and DOJ, they don't

want you to ever acknowledge you're making money off of it or looking for investments." The final four words were omitted from the Indictment. Exhibit 4. Mr. Rowan is not talking about defrauding the United States, obstructing the administration of Medicare, or concealing rebates. *Mr. Rowan is not even discussing any investment he is involved in, has been invited to join, or ever joined*. Instead, he is noting to Provider 1 that Provider 1 is treading on thin ice in a complicated legal environment *in a completely unrelated transaction*.

However, listening to the video and reading the Indictment in parallel suggests that the Government may have presented this statement to the grand jury as an overt act in furtherance of *the charged* § 371 conspiracy, even though the statement was unrelated to the charged conduct. Knowingly misleading the grand jury through the presentation of materially inaccurate or incomplete evidence warrants dismissal. *See Bank of Nova Scotia*, 487 U.S. at 256, 260-61. At a minimum, this misleading presentation of the evidence ought to result in the disclosure of the entirety of the grand jury's proceedings to determine if the Government misled it in other areas. *See United States v. Mahoney*, 495 F. Supp. 1270, 1276-77 (E.D. Pa. 1980) (ordering disclosure of grand jury transcripts based on prosecutor's reliance on "inherently suspect" summaries of testimony); *United States v. Comey*, 809 F. Supp. 3d 396, 414 (E.D. Va. 2025) (ordering disclosure of "all grand jury materials" based on demonstrated irregularities in the proceedings).

Other "overt acts" suffer from the same deficiencies. For example, the Indictment alleges that Mr. Rowan emailed a spreadsheet that calculated provider rebates and sales representative commissions. Indictment, ECF No. 3, ¶ 69(a). But the Indictment leaves out critical context that Ms. Gehrke told the same prosecutors handling this case that Mr. Rowan explicitly directed her not to disclose this information to providers and not to "sell the spread." Ms. Gehrke apparently then told the prosecutors that she "understood this to be a wink-wink situation," but Mr. Rowan's statement was clear. Exhibit 1 at 3. Ms. Gehrke's later and potentially self-serving perception of his statement has no bearing on Mr. Rowan's actual intent. Consistent with *Bank of Nova Scotia,* the Government's presentation raises grave concerns that the grand jury was misled.

**ii. Mr. Rowan is prejudiced by multiple grand juries investigating overlapping factual and legal issues.**

The Government appears to be conducting a coordinated, multi-district grand jury investigation of the same alleged conspiracy by the same lead prosecutor in Mr. Rowan's case. Mr. Rowan's attorneys are aware of at least one other grand jury proceeding that bears directly on the issues presented in the Indictment. *See* Indictment, *United States v. Dubin*, No. 2:26-cr-00166-CDS-BNW (Aug. 4, 2026), ECF No. 1. While it is permissible for multiple grand juries to conduct concurrent or related investigations, *United States v. Fischbach & Moore, Inc.*, 776 F.2d 839, 843 n.4 (9th Cir. 1985), the grand jury process must be conducted in a manner that avoids "manipulation of grand juries by over-zealous prosecutors." *Samango*, 607 F.2d at 882. Nor may the Government "use the grand jury for the sole purpose of pretrial discovery in cases where an indictment has already been returned." *United States v. Star*, 470 F.2d 1214, 1217 (9th Cir. 1972). Here, the Government chose to seek an indictment while at least one other grand jury was likely still investigating and still collecting evidence on the charged conduct. The timing of the Indictment, as part of a massive national takedown, further underscores the need to determine what evidence the Arizona grand jury actually heard at the time it voted.

**iii. The Indictment presents a substantial risk of constructive amendment at trial and double jeopardy exposure.**

The Indictment presents a real risk of constructive amendment or later prosecution for the same offense. Disclosure of the specific theories and transactions *as presented to the grand jury* is critical to ensure that the Government proceeds on the same theory at trial and necessary to prevent Mr. Rowan from being charged with the same offense again.

The Government may not obtain a conviction on uncharged conduct not alleged in the indictment. *United States v. Ward*, 747 F.3d 1184, 1190-91 (9th Cir. 2014). These concerns are substantial and non-speculative here. The Indictment identifies particular transactions underlying each of the counts. Counts 2-4 are predicated on three specific Medicare claims, Counts 6-8 are predicated on three specific wire transfers, and Counts 9-10 are predicated on two specific purchases. Indictment, ECF No. 3, ¶¶ 65, 70, 72. The Government is alleging that

Mr. Rowan caused more than $1 billion in fraud but *affirmatively* declines to state precisely what Medicare claims, transfers, and other transactions Mr. Rowan caused to be submitted. *See* Exhibit 5 at 2 (Letter from DOJ to Mr. Rowan on August 21, 2026) (refusing to identify "all [of the] claims that the Government considers to be false and fraudulent"). The Government also *affirmatively* declines to state precisely what kickbacks Mr. Rowan paid or caused to be paid. *See generally* Exhibit 6 at 2 (Letter from Mr. Rowan to DOJ on August 3, 2026) (requesting information pertaining to each kickback and bribe alleged); Def.'s Mot. for Bill of Particulars 5, ECF No. 20; Gov't's Resp. in Opp'n to Def.'s Mot. for Bill of Particulars 17-18, ECF No. 28 (asserting Government need not identify each kickback and bribe "given the magnitude of the charged conspiracy"); Def.'s Reply in Support of Def.'s Mot. for Bill of Particulars 11, ECF No. 30 (seeking particulars regarding "the act or function attributed to Mr. Rowan").

Although these matters go to the heart of Mr. Rowan's motion for a bill of particulars, ECF No. 20, they are equally important here. The Government can only seek a conviction on the conduct charged. *See Ward*, 747 F.3d at 1192 (finding constructive amendment when defendant was indicted for identity theft as to only two specific victims and the identity of the victims was necessary to satisfy an element of the offense, but the jury heard evidence of other victims); *United States v. Dipentino*, 242 F.3d 1090, 1095-96 (9th Cir. 2001) (finding constructive amendment when jury may have based conviction on uncharged work practice). The Government has committed to disclosing grand jury materials in discovery, but to date, the defense has not received a complete set of such materials, any indication of when it will receive those materials in full, or even an identification of which produced materials were obtained by or presented to the grand jury. *See* Exhibit 7 (Letter from Mr. Rowan to DOJ on August 14, 2026). If the Government feels its disclosures are limited by Rule 6(e), counsel for Mr. Rowan have proposed to jointly move for permission for such disclosure from this Court. *See id*. But the Government has failed to provide those materials and information, and has *affirmatively* declined to jointly move for disclosure. *See* Exhibit 8 (Email from DOJ to defense counsel on August 18, 2026). By simply providing Mr. Rowan with the grand jury

transcripts to show what evidence the grand jury used to indict Mr. Rowan, the Government could substantially solve problems surrounding the vagueness of the Indictment and the potential for amendment. Yet, the Government refuses to engage.

Equally problematic, the Indictment's breadth and vagueness implicate the Fifth Amendment's protection against successive prosecutions once jeopardy attaches. The Ninth Circuit has long recognized that one purpose of the indictment is to protect the defendant from being placed in double jeopardy. *See United States v. Luong*, 965 F.3d 973, 985 (9th Cir. 2020). As discussed above, the Government has charged a nationwide conspiracy spanning December 2021 through June 2024 and encompassing numerous unidentified individuals and entities, multiple providers, multiple alleged kickback arrangement conspiracies, and billions of dollars in claims. Once jeopardy attaches, the Government may not disaggregate portions of that same conspiratorial agreement—by provider, transaction, location, or participant—and prosecute them as additional conspiracies under the same statute. *See Braverman v. United States*, 317 U.S. 49, 52 (1942); *United States v. Bendis*, 681 F.2d 561, 564-66 (9th Cir. 1982). But the Indictment's vagueness concerning the boundaries of the alleged agreement creates a serious risk that Mr. Rowan will be unable to ascertain—and later enforce—the full double jeopardy protection resulting from this prosecution.

**iv. Given the concrete irregularities identified here, verification of proper grand jury procedure is necessary.**

Mr. Rowan acknowledges that the *Williams* court held that federal courts could not use their supervisory power to impose a general obligation to present exculpatory evidence to a grand jury. *See United States v. Williams*, 504 U.S. 36, 51-55 (1992). Accordingly, in the Ninth Circuit, "prosecutors have no obligation to disclose substantial exculpatory evidence to a grand jury." *Navarro*, 608 F.3d at 537 (cleaned up). But *Williams* does not mean prosecutors may mislead the grand jury, present irrelevant but prejudicial evidence, or otherwise engage in misconduct. *See United States v. Basurto*, 497 F.2d 781, 785-86 (9th Cir. 1974) (due process is violated when a defendant must stand trial on an indictment the government knows rests partly on materially perjured grand jury testimony). Rule 6 expressly authorizes disclosure when a

defendant shows that "a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). Traditionally, "[i]n order to overcome a presumption of regularity which attaches to grand jury proceedings, and a general rule of secrecy of matters occurring before the grand jury," courts have required defendants to demonstrate a "compelling" or "particularized need" for the materials. *United States v. Rosendin Elec., Inc.*, 122 F.R.D. 219, 222-23 (N.D. Cal. 1987); *Diaz*, 236 F.R.D. at 480; *see also United States v. Weinstein*, No. CR-25-00541-001-PHX-DJH, 2025 WL 1884247, at *2 (D. Ariz. July 8, 2025) (disclosure is appropriate where defendant shows "particularized need" and seeks material "only to avoid a possible injustice").

Mr. Rowan has identified compelling evidence and a particularized need to overcome the usual presumption of regularity. The Government in Mr. Rowan's case knew of abundant exculpatory evidence and evidence that puts the statements in the Indictment into their proper context. The existence of this known exculpatory and contextual material and the Government's potential failure to present it provide a non-speculative reason to believe the Government's presentation was materially misleading by omitting this evidence. Indeed, a failure to present known exculpatory evidence to the grand jury would run counter to DOJ's own policies. *See* U.S. Dep't of Just., Just. Manual § 9-11.233 (2026).

**b. The need for disclosure is greater than the need for continued secrecy.**

The cumulative effect of the Government's conduct establishes Mr. Rowan's particularized need for grand jury materials. The circumstances identified in this Motion, considered together, strongly suggest that the grand jury proceedings were tainted by misdirection and bias. *See Samango*, 607 F.2d at 884 (finding "cumulative effect" of many "errors and indiscretions" "operated to the defendants' prejudice by producing a biased grand jury"). Disclosure is necessary to avoid a very likely injustice. *See Plummer*, 941 F.2d at 806.

Mr. Rowan's need for disclosure is greater than the continued need for secrecy. *See id*. In the Ninth Circuit, courts consider five factors to determine the need for secrecy, all of which weigh in favor of disclosure. *See In re Grand Jury Proc.*, 62 F.3d 1175, 1179 n.2 (9th Cir.

1995). The first three factors protect the grand jury's investigation process itself and here are "insignificant . . . because the grand jury investigation has been terminated." *See id.*; *see also Reid*, 477 F. Supp. 3d at 1186 (finding little need for grand jury secrecy after indictment and completion of the investigation). There are also no credible safety concerns to prevent disclosure (the fourth factor) and the grand jury has already indicted Mr. Rowan (the fifth factor). As noted below, Mr. Rowan is only seeking transcripts from cooperating testifying witnesses, which would be subject to *Jencks* regardless, and law enforcement summary agents. There is no material danger of a general chilling effect on civilian witness testimony.

**c. Mr. Rowan seeks only limited materials.**

Mr. Rowan's request is no broader than necessary. Mr. Rowan seeks the disclosure of all instructions provided to the grand jury and transcripts of cooperating and law enforcement witness testimony. A protective order has been entered in this case, ECF No. 16, which limits the scope of potential disclosure, and counsel are willing to enter into any additional protections this Court deems necessary, including reviewing the materials in a sensitive compartmented information facility. To the extent this Court is unwilling to order disclosure of the entire record, Mr. Rowan requests that this Court order *in camera* review of the grand jury transcripts to allow the Court to review and subsequently disclose to Mr. Rowan any materials necessary to avoid potential injustice. *See Reid*, 477 F. Supp. 3d at 1186-87.

**E. Conclusion**

For the foregoing reasons, Mr. Rowan respectfully requests that the Court order:

- The disclosure of all instructions given to the grand jury;
- The grand jury transcripts of all cooperating witnesses likely to testify at trial; and
- The grand jury transcripts of law enforcement officers.

//

//

Respectfully submitted,

*/s/ Mark S. Kokanovich*

Louis J. Manzo
BEVERIDGE & DIAMOND, P.C.
Mark S. Kokanovich
Helen Hitz
BALLARD SPAHR LLP

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of September, 2026, I electronically transmitted the foregoing document to the U.S. District Court Clerk's Office by using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants.

*/s/ Mark S. Kokanovich*
Mark S. Kokanovich